**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ADVANTA BANK,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 09-2423 (JMF)** |
| **FEDERAL DEPOSIT INSURANCE CORPORATION,** | |
| **Defendant.** | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was referred to me for all purposes.  Currently pending and ready for resolution

is <u>Plaintiff's Motion for a Temporary Restraining Order and /or Preliminary Injunction</u> [#3].  For

the reasons stated below, the motion will be granted.

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE**

1.      This case involves four related entities - Advanta Corp. is the parent company which

        owns Advanta Bank Holding Company ("Holding Company").  The Holding Company

        owns 100% of the shares of Advanta Bank (the "Bank), the plaintiff.  The Bank is

        affiliated with Advanta Bank Corp., Draper, Utah ("ABC"), an industrial bank whose

        primary business is issuing and servicing credit cards to small businesses.  ABC is a first-

        tier subsidiary of Advanta Corp., the Bank is a second tier subsidiary of Advanta Corp.

2.      As of September 30, 2009, Advanta Corp. had $2,082,899,000 in deposits,

        $2,497,897,000 in assets, and $2,465,936,000 in total liabilities.  Its year to date net

income was negative $482,459,000.  <u>Declaration of Julie D. Howland</u> ("Howland Decl."), ¶ 9.

3.     As of September 30, 2009, ABC had $2,092,114,000 in deposits, $2,284,186,000 in total assets and a Tier 1 Leverage Capital Ratio of 3.73%. <u>Id.</u> at ¶ 8.

4.     As of September 30, 2009, the Bank had $10,330,000 in deposits, $21,813,000 in total assets and a Tier 1 Leverage Capital Ratio of 39.39%.  On November 30, 2009, the Bank's total deposits were $268,404 and its total assets equaled $10,249,951. <u>Id.</u> at ¶ 7. This indicated a reduction between September 30, 2009 and November 30, 2009 of $10,061,596 in deposits and of $11,563,049 in assets at the Bank. <u>Id.</u>  In an application to terminate insurance received by the FDIC on January 13, 2010, the Bank indicated that it had divested itself of its remaining deposits and had approximately $10 million in assets. <u>Id.</u> at ¶ 7.  The termination process which began in January will be completed June 30, 2010, at which point the Bank will no longer be insured by the FDIC.

5.     In 2007, the Bank converted to a state-chartered nonmember bank.  The Bank does not operate as a community bank; its primary activity is to provide deposit services for affiliate companies.  According to a Report of Examination of the Bank, as of December 31, 2008, the FDIC was concerned that the Bank lacked any apparent plans for profitable operations and advised that "Management must either formulate a plan for offering banking activities to the public or submit a plan for voluntary liquidation and termination of deposit insurance." <u>Id.</u> at ¶ 5.

6.     After deducting Bank and ABC assets and liabilities from Advanta Corp.'s accounts, there is $210 million dollars in Advanta only assets and $213 million in Advanta only

debt. Id. at ¶ 9.

7.      The Boards of Directors of the four entities are interlocking and have significant overlap. Four of the six directors of the Bank are inside directors who are executive officers or directors of Advanta Corp.  Three of these four directors were also directors of ABC until November 13, 2009. Id. at ¶¶ 10-11.  These directors resigned from ABC on November 13, 2009 at the request of the FDIC due to the FDIC's concerns about conflicting loyalties. Id. at ¶ 18.

8.      In May of 2009, Advanta closed ABC credit cards to new transactions as a result of early amortization on a securitization trust, and ABC ceased issuing new credit cards.  This resulted in significant liquidity problems for ABC. Id. at ¶ 13.

9.      In June 2009, the FDIC and ABC stipulated to a Cease and Desist Order ("ABC Order") requiring ABC to maintain its Tier 1 Leverage Capital Ratio at a minimum of five percent.  In compliance with this order, ABC advised the FDIC in October 2009 that its Tier 1 Leverage Capital Ratio was 3.73% as of September 30, 2009. Id. at ¶ 14.  The FDIC ordered ABC to submit a capital restoration plan, which ABC refused to do. Id. at ¶ 18.

10.     On November 8, 2009, Advanta and several subsidiaries, but not ABC or the Bank, filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. Id. at ¶ 16.

11.     On November 13, 2009, the FDIC was advised that Advanta would disaffirm a tax-sharing agreement with ABC, which could have resulted in a $65 million payment to ABC and adequately capitalized ABC.  At the same meeting, ABC suggested that the

3

FDIC place ABC in receivership. Id. at ¶ 18.

12.     ABC and the Bank both remain open.  The risk posed to the Insurance Fund by ABC
        could, however, total several hundred million dollars due to the extremely high losses in
        its credit card portfolio. Id. at ¶ 19.  Under the provisions of 12 U.S.C. § 1815(e), moneys
        remaining in the Bank at the time of the potential failure of ABC would be used to
        guarantee the deposits in ABC.

13.     On November 19, 2009, the FDIC proposed that the Bank stipulate to a Cease and Desist
        order, which would restrict transactions between the Bank and Advanta and its affiliates
        and prohibit the payment of dividends.  This order reflected the FDIC's concern about the
        interlocking management between Advanta and the Bank and the failure of the same
        directors to uphold their duties of care and loyalty to ABC. Id. at ¶ 21.  The Bank rejected
        this stipulation pursuant to advice of counsel because of the Bankruptcy proceedings
        underway for Advanta Corp.. Id. at ¶ 22.

14.     During a review of the Uniform Bank Performance Report filed by the Bank, the FDIC
        Case Manager and an FDIC Examiner noticed that two questionable transactions had
        taken place between June 30, 2009 and September 30, 2009. Id. at ¶ 26.  The Bank had
        reduced its liabilities by $5.3 million and had booked a tax-expense provision of $2.6
        million. Id.  These transactions were unusual due to "the size and nature of the Bank's
        activities." Id.  The FDIC has attempted to gather an explanation via interviews and
        review of documents and has received no satisfactory explanation. Id.

15.     Julie D. Howland, Assistant Regional Director, FDIC, and responsible for supervision of
        the Bank, recommended issuing a Temporary Cease and Desist Order to prevent the Bank

from engaging in transactions with Advanta and other affiliates, which would cause dissipation of assets of the Bank. Id. at ¶ 27-30.  She premised her recommendation on 1) the conflicts of interests of the interlocking directors of Advanta and the Bank, 2) the inability of the Bank to perform independent reviews and provide explanations of the irregular transactions, and 3) the Bank's failure to maintain adequate books and records.

16.    The FDIC issued the Temporary Cease and Desist Order to the Bank on December 17, 2009 pursuant to 12 U.S.C. § 1818(c).[1]

17.    The Bank responded with the instant litigation pursuant to its right under 12 U.S.C. § 1818(c)(2) to seek judicial review of the issuance of a Temporary Cease and Desist Order.  The motion for a temporary restraining order or permanent injunction of the FDIC was briefed and oral argument was held on January 20, 2010.  All parties agree that the case is ripe for adjudication and a final decision on the issuance of an injunction.

## CONCLUSIONS OF LAW

Section 8(b) of the Federal Deposit Insurance Act ("FDIA"), codified at 12 U.S.C. § 1818(b), grants Federal banking agencies the power to issue cease and desist orders if the agency has "reasonable cause to believe that the depository institution [is] . . . about to engage in an unsafe or unsound practice . . . is violating or has violated . . . a law, rule or regulation."  12 U.S.C. § 1818(b)(1).  Such an order is accompanied by notice of a hearing to be held not earlier than 30 or less than 60 days after service of the notice.  The order becomes effective at the expiration of the 30-day period and remains effective until the conclusion of the administrative

---

[1] All references to the United States Code are to the electronic versions in Westlaw or Lexis.

5

proceeding.  Because some instances require regulatory action faster than the administrative

process can accommodate, Congress also granted the Federal banking agencies the authority to

issue a temporary cease and desist order. 12 U.S.C. § 1818(c)(1).[2]  These temporary orders

become effective upon service on the financial institution and remain in place until the

conclusion of the administrative process.  The FDIC issued a temporary cease and desist order

because Advanta Bank refused to stipulate to a cease and desist order and because of the risk that

any money in the Bank would be "upstreamed" to the bankrupt parent company to be used to pay

off creditors instead of being held by the Bank and made available to cross guarantee the losses

of ABC in the event it fails.  The question before the court today is whether the issuance of that

order exceeded the FDIC's authority granted by Congress in § 1818.

I.      FDIA § 8(c)

        The issuance of a cease and desist order under §1818(b) is accompanied by a decision by

a neutral arbiter determining whether the conduct of the depository institution was legitimate.

Orders issued under §1818(b) do not become binding until the conclusion of an administrative

hearing.  On the other hand, temporary cease and desist orders issued under §1818(c) are binding

---

[2] The text of §1818(c)(1) reads as follows:

> Whenever the appropriate Federal banking agency shall determine that the violation or threatened violation or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings conducted pursuant to paragraph (1) of subsection (b) of this section, the agency may issue a temporary order . . .

upon service on the financial institution and remain in effect until the conclusion of the

administrative process.  Thus, a depository institution is bound by the conclusion of its adversary

(in this case the FDIC) that it has or is about to engage in unsafe or unsound banking practices

without neutral adjudication of that decision.  Because of this, §1818(c)(2) allows the institution

to go to District Court to seek an injunction whenever the FDIC issues such a temporary cease

and desist order.  Thus, the requirements of §1818(c)  for the issuance of a temporary cease and

desist order are stricter than those in §1818(b).

The report from the Senate Committee on Banking and Currency to accompany the

passage of the Financial Institutions Supervisory Act of 1966 explicitly notes that the FDIC must

be reasonable in its determination that the threatened insolvency or dissipation of assets be likely.

In discussing subsection (c)(1) the report notes that

> The appropriate Federal lending agency would have discretionary
> authority to issue such an order whenever it determined that the
> violations or threatened violations or practices, or the continuation
> thereof, are likely to cause insolvency or substantial dissipation of
> assets or earnings of the bank, or are likely to otherwise seriously
> prejudice the interests of its depositors. . . . The change in the
> language of the original bill from 'could cause' to 'is likely to
> cause' insolvency or substantial dissipation of assets or earnings, or
> 'is likely to' otherwise seriously prejudice the interests of
> depositors, is designed to reflect the Committee's intent that the
> possibility of such consequences be a reasonable one and not
> merely a theoretical one.

S. Rep. No. 1482, 89th Cong., 2d Sess. (1966), at 22.

Because Congress was aware that the power it was granting to Federal banking agencies

was a broad and extreme authority, the threshold requirements for meeting that bar were

intentionally modified from "could cause" to "is likely to cause."  The question before the court

7

is whether the present facts meet that threshold.

The statute itself does not specify the standard by which the FDIC's exercise of its power to issue a cease and desist order, effective upon service, is to be judged. The Court is bound by the principle of statutory interpretation that each word in the statute matters[3] and that it must therefore appear that the Bank's actions are likely to cause insolvency or substantial dissipation of assets.

The legislative history of the statute states that "[i]n ruling on any such application, the district courts will, of course, be guided by the traditional tests employed in actions for temporary or preliminary relief from administrative agency action when the public interest is involved." S. Rep. No. 1482, 89th Cong., 2d Sess. (1966), at 22. But, there is little in the way of precedent in the interpretation of §1818(c). Challenges to the issuances of temporary orders are rare, and injunctions setting them aside even more so. Two other district courts faced with the interpretation of the same section have concluded that it must be read disjunctively. Paul v. Office of Thrift Supervision, 763 F. Supp. 568, 573 (S.D. Fla. 1990); Mid America Bancorporation v. Board of Governors, 523 F. Supp. 568, 576-78 (D. Minn. 1980). That is to say, the "or" separating the requirements indicates that each of them must be read separately. Thus, the FDIC has the authority to issue a temporary order in situations where the actions of the financial institution are likely to cause:

(a) insolvency; or

(b) significant dissipation of assets; or

(c) weaken the condition of the institution; or

---

[3] Duncan v. Walker, 533 U.S. 167, 174 (2001).

(d) otherwise prejudice its depositors.

12 U.S.C. § 1818(c)(1).

II.    Application to the Present Case

The Bank contends that absent any harm to *its* depositors (not the depositors of ABC or any other entity) the application of the statute is inappropriate.  All parties agree that the Bank is not going to fail and that the depositors of the Bank are not at risk.  However, such a reading ignores the "or" within §1818(c).  The fact that the dissipation of assets will not necessarily harm the depositors of the Bank does not mean that the assets will not be dissipated, nor does it mean that the statute cannot be applied for that reason.

This, however, does not end the inquiry.  The language of the statute and the intent of Congress as demonstrated by the Committee report is quite clear:  temporary cease and desist order are only to be issued upon a finding that the continuation of unsafe or unsound banking practices must be the action which "is likely to cause . . . [the] . . . dissipation of assets or earnings of the depository institution." 12 U.S.C. § 1818(c)(1).  This was the specific language which Congress changed from the draft versions of the legislation to the one which was ultimately passed.  Congress sought to ensure that the causation of the dissipation of assets was closely linked to the conduct in question, not merely a theoretical consequence of that conduct.

The Notice of Charges accompanying the temporary cease and desist order, along with the declaration of Ms. Howland, specify what the FDIC believes are unsafe or unsound banking practices.  The lack of independence of the Directors and their conflicting loyalties to both Advanta Corp., the bankrupt parent company, and the Bank have made it impossible for them to prioritize the interests of the Bank ahead of the parent company.  This was the reason the

Directors were removed from the ABC Board by the FDIC, and it helps to explain the failure of

ABC, which threatens to leave the FDIC vulnerable to claims for hundreds of millions of dollars.

The Notice of Charges, however, does not indicate that the termination of the Bank itself

is an unsafe or unsound practice, nor could it.  The Bank was told by the FDIC that it either

needed to formulate a plan to become profitable (i.e. begin community banking) or close and

terminate its insurance.  Given the choice between the two, the bank chose termination and began

the process of returning money to its depositors and otherwise winding up its affairs.  The FDIC

cannot ask the Bank to begin termination, and then declare that termination, once it begins and

nears its conclusion, is an unsafe or unsound banking practice.  Nor does the FDIC claim that the

unsafe banking practices (i.e., the conflicting duties of the Board of Directors) caused the

termination.  Thus, it is not the unsafe banking practices which are causing the dissipation of

assets, but rather the process of termination, *which the FDIC started*, which are "dissipating" the

assets.  Under the statute, the FDIC can only issue a temporary cease and desist order where the

possibility of the dissipation of assets is more than a theoretical consequence of the unsafe or

unsound practice.  Here the assets are being dissipated because the FDIC asked the bank to

liquidate and terminate its insurance.  While the liquidation (and thus the dissipation of assets)

may, theoretically, be linked somehow to the unsafe or unsound practice, the statute and

Congress, which passed it, require more.  Thus, the FDIC acted outside the clear boundaries of

§1818(c)'s grant of authority in issuing the temporary cease and desist order.

The FDIC had entered into its cease and desist agreement with ABC in June of 2009 and

knew of the relationships between ABC, the Bank and Advanta Corp. prior to the transmittal

letter dated July 6, 2009 requiring the Bank to terminate its insurance and wind up its affairs.  At

that time, the FDIC could have worked to ensure that any money in the Bank be preserved in order to insure against losses at ABC, but it did not.  Instead, it waited until a process that it helped to start was nearly complete to attempt to intervene and stop it, and, in doing so, exceeded its statutory authority.  The deference due to the agency in interpreting §1818(c) is not limitless and does not allow for the contravention of the law which gave that agency its authority.

Because the agency's issuance of a temporary cease and desist order was outside the bounds of a clear grant of authority from Congress, the plaintiff's motion for an injunction setting aside the temporary cease and desist order pursuant to §1818(c)(2) must be granted.

An Order accompanies these Findings of Fact and Conclusions of Law.

 

 

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE